COURT OF APPEALS OF VIRGINIA


Present:  Judges Bumgardner, Humphreys and Clements
Argued at Richmond, Virginia


WEINTHAL LOCKHART
                                        OPINION BY
v.   Record No. 2575-99-3      JUDGE JEAN HARRISON CLEMENTS
                                      FEBRUARY 20, 2001
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
                    Keary R. Williams, Judge

        Robert M. Galumbeck (Dudley, Galumbeck,
        Necessary & Dennis, on brief), for appellant.

        Leah A. Darron, Assistant Attorney General
        (Mark L. Earley, Attorney General, on brief),
        for appellee.


     Weinthal Lockhart was tried by jury and convicted of

forcible sodomy for having anally and orally sodomized a boy

less than thirteen years of age, in violation of Code

§ 18.2-67.1.  On appeal, he contends the trial court erred (1)

in denying his motion to suppress evidence obtained from a

search of his home that was invalid because the magistrate

failed to file the affidavit supporting the search warrant

within thirty days as required by Code § 19.2-54, (2) in not

allowing the admission of evidence of the victim's misconduct at

school and of his tendency to always make excuses for that

misconduct, (3) in denying his motion to set aside the verdict

based upon his contention that the verdict was not supported by

sufficient evidence because the victim's testimony was inherently incredible, and (4) in denying his post-trial motion to set aside the verdict and dismiss the indictment because the Commonwealth failed to timely disclose exculpatory evidence. Finding no error, we affirm the conviction.

## I. BACKGROUND

In July 1995, eleven-year-old M.B. joined his older brother, A.B., in working for Lockhart a few days a week on his Buchanan County farm, cutting weeds, feeding livestock, and doing other chores. Lockhart always paid them in cash or by check for their work. Over time Lockhart also bought M.B. a stereo, a bicycle, and a motorcycle. Occasionally, M.B. would go to Lockhart's farm not to work but to ride motorcycles with Lockhart's son, D., who was a year older than M.B.

Approximately one month after M.B. began working for him, Lockhart started putting his hands down the child's pants and masturbating him. Two weeks later, Lockhart began anally sodomizing M.B. Lockhart made M.B. lie naked on Lockhart's bed on his stomach and Lockhart, with his pants pulled down to his ankles, put his penis in M.B.'s anus. He used a lubricant from a blue and white tube he kept on his nightstand.

Lockhart anally sodomized M.B. in his bedroom approximately once a week on ten to fifteen different occasions. Each incident lasted approximately ten minutes. On two occasions, Lockhart also orally sodomized M.B., placing M.B.'s penis in his

mouth. In discussing these activities with M.B., Lockhart referred to oral sodomy as a "blow job" and anal sodomy as being "butt-fucked." Lockhart never asked M.B. to perform anal or oral sodomy on him.

M.B., having observed Lockhart totally naked three to five times, described Lockhart as having a lot of body hair all over him, including in the area of his genitals and buttocks; as having scars and a lot of moles on his back; and as being uncircumcised. The Commonwealth's photographs of Lockhart's nude body, viewed in their entirety, corroborated M.B.'s description.

M.B. also identified several items recovered by the Commonwealth during a search of Lockhart's home, including an artificial vagina, a magazine showing pictures of naked men with erections, and a magazine depicting a man using a device purported to be a penis enlarger. M.B. first saw the artificial vagina on a shelf in Lockhart's closet when he was getting a shirt and then later when Lockhart removed it from the closet and showed it to him. He first saw the magazines under Lockhart's bed when Lockhart asked him to retrieve his safe from there. Later, he observed Lockhart looking at the magazine showing naked men with erections. Additionally, he and Lockhart discussed the magazine depicting the penis enlarger and Lockhart indicated he had such a device.

M.B. first reported the sexual abuse to his parents on November 16, 1996, at a time when, according to M.B.'s mother, M.B.'s father was upset because M.B. acted as if he loved Lockhart more than he loved his father. M.B. admitted he finally told his parents about the abuse because his father was distressed at the thought that M.B. and his brothers did not love him anymore and cared more about Lockhart than they did about him.

Approximately two weeks before telling his parents about the molestation, M.B. told his fifteen-year-old uncle and his brother A.B. about it. M.B. then discussed the situation at least one other time with A.B. before informing his parents. A.B. testified that he observed Lockhart masturbating M.B. on the bed in Lockhart's bedroom shortly after M.B. first told him about the sexual abuse.

Dr. Roy Thomson, a pediatrician, physically examined M.B. on November 21, 1996. He found that M.B.'s anal opening was enlarged and that the muscles of his perineal sphincter had lost their normal tone due to repeated penetration of the anus by an object larger than the anal opening and firm enough to cause the resultant trauma. The doctor concluded that the use of a penis to repeatedly penetrate M.B.'s anus would be consistent with his physical findings. M.B. never had anal intercourse with anyone else and never had anything else placed inside his rectum prior to being examined by the physician.

Taking the stand in his own defense, Lockhart, who was in his fifties, testified that he had been separated from his wife for eight years. He lived with his son, D., on the farm. M.B., with his parents' permission, would come to his farm two or three times a week to do various chores. Occasionally, M.B.'s parents would call and ask Lockhart to look after M.B. at Lockhart's home. A "good worker," M.B. had the run of the house and Lockhart trusted him like a son.

Lockhart further testified that, approximately a month before M.B. accused Lockhart of molesting him, M.B. got into a "major fight" with D. and cut his eye. After the fight, Lockhart told M.B. that he could not come to the farm anymore.

Denying that he ever showed them to M.B., Lockhart stated that he had the artificial vagina for approximately nine years and the two sexually oriented magazines referred to by M.B. for five or six years. He further stated that he used the lubricant found in his bedroom as a conductor gel on the electrodes of a medical device he used to decrease the pain in his injured back.

Lockhart denied ever threatening M.B., touching him on his genitals, or sodomizing him, anally or orally. He suggested that M.B. concocted the story about being sexually abused because he was mad at Lockhart for banishing him from the farm after the fight with D. He could not, though, suggest a reason why A.B. would testify that he had observed such abuse.

## II.  MOTION TO SUPPRESS

The sexually oriented items obtained by the Commonwealth from Lockhart's residence and admitted at trial were seized pursuant to a search warrant issued by a magistrate.  Lockhart contends those items, and the photographs thereof, should have been suppressed because the search was invalidated by the magistrate's failure to file the supporting affidavit with the clerk of the circuit court within thirty days of issuance of the search warrant, as required by Code § 19.2-54.

Code § 19.2-54 requires the filing of a supporting affidavit with the officer authorized to issue search warrants (a magistrate, in this case) prior to the issuance of a search warrant.  The statute sets forth what must be included in the affidavit and further provides that

> [s]uch affidavit shall be certified by the officer who issues such warrant and delivered <u>by such officer or other officer authorized to certify such warrants</u> to the clerk of the circuit court of the county or city wherein the search is made within seven days after the issuance of such warrant . . . .
>     Failure of <u>the officer issuing such warrant</u> to file the required affidavit shall not invalidate any search made under the warrant unless such failure shall continue for a period of thirty days.

Code § 19.2-54 (emphasis added).

Here, the affidavit filed in support of the search warrant was subscribed and sworn to before the magistrate on November 20, 1996, by Larry Crouse, a special police officer and

paralegal assistant for the office of the Commonwealth's

Attorney. The magistrate issued the search warrant on the same

date. Crouse executed the warrant later that same day and filed

it the following day, November 21, 1996, with the clerk of the

circuit court in Buchanan County, where the search was made.

Along with the original search warrant, Crouse filed an

inventory of the items seized during the search and the original

supporting affidavit.[1] More than ten months later, on August 25,

1997, the magistrate who issued the search warrant filed a copy

of the affidavit with the clerk of the circuit court.

Lockhart contends that Code § 19.2-54, being penal in

nature, must be construed strictly against the Commonwealth and

in favor of the accused. Therefore, he argues, the magistrate's

failure to file the required affidavit within the prescribed

thirty days invalidated the search. Hence, his argument

continues, the evidence seized pursuant to the search was not

admissible and should have been suppressed.

The Commonwealth maintains that the Supreme Court's

rationale in Quintana v. Commonwealth, 224 Va. 127, 295 S.E.2d

643 (1982), requires a less technical and less constrained

reading of Code § 19.2-54 when, as here, the notice-based

---

[1] Crouse, rather than the magistrate who issued the search
warrant, also certified the original affidavit when he delivered
it to the clerk's office on November 21, 1996. Lockhart,
however, does not challenge the certification of the affidavit
on appeal.

purpose of the statute is satisfied.  Based on the record before us, we agree with the Commonwealth that the rationale in Quintana is controlling.

In Quintana, the defendant moved for suppression of evidence seized in a search because, as in the instant case, the magistrate failed to strictly comply with the procedural requirements of Code § 19.2-54.  Specifically, the magistrate who issued the search warrant in Quintana failed to certify the supporting affidavit before he filed it with the clerk of the circuit court and did not do so within thirty days after issuance of the search warrant.  According to the defendant, the uncertified affidavit was not "the required affidavit" under the terms of the statute.  Hence, the search was invalid, he concluded, because the magistrate failed to file the required affidavit within thirty days and because the statute necessarily implies that, when the failure to file the required affidavit continues beyond thirty days, the search is invalid even if conducted the day the affidavit is filed.

Rejecting both the defendant's premise and conclusion, the Court in Quintana reasoned as follows:

> Having in mind the Fourth Amendment purposes the statute was designed to foster, we believe "the required affidavit" means the affidavit required to support issuance of a search warrant.  Under the Fourth Amendment warrant requirement, the content of that affidavit must be sufficient to support a finding of probable cause by a neutral and detached magistrate.  The [C]onstitution

> does not require the magistrate to certify
> an affidavit.  The purpose of that
> requirement in our statute is to insure that
> the affidavit filed with the clerk for the
> information of the accused is the same
> affidavit upon which the finding of probable
> cause was based. . . .
>     Finding that the statutory purpose was
> fully served and that the omission of the
> magistrate's signature in the jurat caused
> defendant no prejudice, we hold that the
> trial court properly overruled defendant's
> motion to suppress.

Id. at 136, 295 S.E.2d at 646-47.

Plainly, the Supreme Court in Quintana, in addressing the certification requirement of Code § 19.2-54, gave greater weight to the achievement of the notice-based purpose of the statute than to a strict, technical reading of the statute.  We believe the same reasoning applies to the filing requirement of Code § 19.2-54.

The United States Constitution does not require that the supporting affidavit be filed by the magistrate (or other officer authorized to certify search warrants).  The purpose of the filing requirement, like the certification requirement, "'is to give the defendant reasonable opportunity to determine that the affidavit on file is the same one upon which the determination of probable cause was based.'"  Robertson v. Rogers, 2 Va. App. 503, 507, 346 S.E.2d 41, 44 (1986) (quoting Garza v. Commonwealth, 228 Va. 559, 566, 323 S.E.2d 127, 131 (1984)), aff'd, 360 S.E.2d 715 (1987).

Here, the supporting affidavit filed by Crouse was the same one he subscribed before the magistrate. The affidavit was on file in the clerk's office available for inspection by Lockhart the day after the search warrant was issued. We find, therefore, that, even though the affidavit was delivered to the clerk's office by the officer who executed the search warrant rather than by the magistrate who issued the warrant, the notice-based purpose of Code § 19.2-54 was achieved and Lockhart suffered no prejudice as a result of the affidavit not having been filed by the magistrate.

Accordingly, we hold that the trial court did not err in denying Lockhart's motion to suppress.

### III.  EVIDENCE OF VICTIM'S MISCONDUCT AT SCHOOL

During cross-examination at trial, Lockhart's counsel asked M.B.'s mother if M.B. had any disciplinary problems at school during the time period he claimed Lockhart had sexually abused him. The Commonwealth objected, asserting that such evidence was not relevant to the issue of whether Lockhart sodomized the child. When asked by the court how such evidence was relevant, Lockhart's counsel stated only that he intended to ask M.B.'s mother whether, when M.B. had disciplinary problems at school, he would make excuses for those problems. The trial court sustained the Commonwealth's objection, and Lockhart's counsel proceeded to a different subject.

Lockhart now contends the trial court erred in not allowing him to introduce evidence of the victim's misconduct at school and of the excuses he made for that misconduct. He asserts in his brief on appeal that such testimony was intended to illustrate M.B.'s propensity to fabricate excuses and make up stories as explanations when accused of wrongdoing at school and to draw a connection between those incidents of fabrication and the claim by M.B. that Lockhart sodomized him. That claim of molestation, Lockhart asserts, was made up by M.B. as an explanation or excuse for his banishment from Lockhart's farm for fighting with D. and in response to his father's accusation that M.B. cared more about Lockhart than he did about him.

"Evidence of specific acts of misconduct is generally not admissible in Virginia to impeach a witness' credibility. However, where the evidence . . . is relevant to show that a witness is biased or has a motive to fabricate, it is not collateral and should be admitted." Banks v. Commonwealth, 16 Va. App. 959, 963, 434 S.E.2d 681, 683 (1993) (citations omitted).

When, however, an objection is sustained and a party's evidence is ruled inadmissible, as in this case, "the party must proffer or avouch the evidence for the record in order to preserve the ruling for appeal; otherwise, the appellate court has no basis to decide whether the evidence was admissible." Smith v. Hylton, 14 Va. App. 354, 357-58, 416 S.E.2d 712, 715

(1992).  Thus, we will not consider testimony which the trial court has excluded before it was presented without a proper showing of what that testimony would have been.  Holles v. Sunrise Terrace, Inc., 257 Va. 131, 135, 509 S.E.2d 494, 497 (1999).

Here, we find nothing in the record that constitutes a proper proffer of the rejected evidence.  No proffer was made of the mother's expected response to the question she was asked or of any other questions that she would have been asked and answers that she would have given.  Likewise, Lockhart did not proffer any other evidence from other sources that, if believed, would allow the fact finder to reasonably infer that M.B. had a motive to falsely implicate Lockhart in order to explain or excuse his own misconduct.  Despite Lockhart's suggestion to the contrary, the response by defense counsel to the trial court's query regarding the relevance of such evidence provides no basis for determining the admissibility of the rejected testimony of the mother.

Hence, without a proper proffer, we cannot ascertain on appeal whether the evidence Lockhart sought to introduce was relevant to show that M.B. had a motive to fabricate his testimony.  Lockhart's failure to make such a proffer therefore precludes appellate review of this claim.

## IV.  SUFFICIENCY OF THE EVIDENCE

Lockhart also challenges the sufficiency of the evidence to sustain his conviction.  He contends the trial court should have set aside the jury's verdict as contrary to the law and evidence because he was convicted almost wholly on the victim's testimony, which, he contends, was inherently incredible.

Specifically, Lockhart argues that M.B.'s testimony was so replete with inconsistencies and contradictions and so contrary to human experience that it was unbelievable.  He identifies several evidentiary details in the case about which he believes M.B.'s testimony was inconsistent, including Lockhart's state of undress before the first act of anal intercourse; the timing of the last act of anal intercourse relative to when M.B. informed his parents about his sexual encounters with Lockhart; the total number of incidents of sodomy; whether M.B. kept returning to Lockhart's farm because he thought Lockhart would stop having sex with him or because Lockhart threatened him; the hairiness of Lockhart's pubic area and buttocks; and whether M.B. watched pornographic videos at Lockhart's house and, if so, the number of videos watched.  The evidence identified by Lockhart as being contrary to human experience includes M.B.'s testimony that he did not immediately go home or call his parents the first time he was sodomized by Lockhart; that he waited so long to tell his brother, uncle, and parents about the abuse; that his brother, who was often at Lockhart's farm with him, did not see him

having sex with Lockhart until shortly before he reported it to his parents; and that Lockhart, despite watching pornographic videos and engaging in sex with him and reading a pornographic magazine in front of him, never discussed such sexual activities with him and attempted to hide the magazine from him.

When the sufficiency of the evidence is challenged on appeal, we must consider the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom."  Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1987).  Furthermore, a conviction will not be reversed unless "it appears from the evidence that it is plainly wrong or without evidence to support it."  Sutphin v. Commonwealth, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

This case turns on the credibility of a young victim of sexual abuse whose testimony clearly was not consistent in all respects.  Faced with the same issue in Swanson v. Commonwealth, 8 Va. App. 376, 382 S.E.2d 258 (1989), we affirmed the defendant's conviction, noting, in reaching our decision, as follows:

> The fact that a witness makes inconsistent statements in regard to the subject matter under investigation does not render his testimony nugatory or unworthy of belief.  It is the province of the trier of the facts—jury or judge—"to pass upon such inconsistent statements and give or withhold their assent to the truthfulness of the particular statement."  It is firmly

> imbedded in the law of Virginia that the
> credibility of a witness who makes
> inconsistent statements on the stand is a
> question for the jury, or for the trial
> court as a trier of the facts sitting
> without a jury.

Id. at 378-79, 382 S.E.2d at 259 (quoting Shelton v. Mullins,

207 Va. 17, 22, 147 S.E.2d 754, 758 (1966)).

As we further noted in Swanson:

> "In testing the credibility and weight
> to be ascribed to the evidence, we must give
> trial courts and juries the wide discretion
> to which a living record, as distinguished
> from a printed record, logically entitles
> them.  The living record contains many
> guideposts to the truth which are not in the
> printed record; not having seen them
> ourselves, we should give great weight to
> the conclusions of those who have seen and
> heard them."
>         When the law says that it is for triers
> of the facts to judge the credibility of a
> witness, the issue is not a matter of
> degree.  So long as a witness deposes as to
> facts which, if true, are sufficient to
> maintain their verdict, then the fact that
> the witness' credit is impeached by
> contradictory statements affects only the
> witness' credibility; contradictory
> statements by a witness go not to competency
> but to the weight and sufficiency of the
> testimony.  If the trier of the facts sees
> fit to base the verdict upon that testimony
> there can be no relief in the appellate
> court.

Id. at 379, 382 S.E.2d at 259 (quoting Bradley v. Commonwealth,

196 Va. 1126, 1136, 86 S.E.2d 828, 834 (1955)).

The issue to be resolved in this case was one of fact.  As

such, it was properly before the jury.  The members of the jury

saw and heard M.B. testify at trial.  Unlike us, they were able

to observe and evaluate him and to weigh his testimony accordingly, as well as the testimony of the other witnesses, including Dr. Thomson, who confirmed that M.B.'s anus had been repeatedly penetrated; M.B.'s brother A.B., who testified that he had observed Lockhart masturbating M.B.; and Lockhart himself.

During closing argument, Lockhart's counsel highlighted for the jury the purported discrepancies and inconsistencies in M.B.'s testimony. Lockhart's counsel also identified for the jury those portions of M.B.'s testimony that, according to the defense, were contrary to human experience. Nevertheless, the jury found the victim credible, resolving the conflicts and inconsistencies in his testimony against Lockhart and finding ultimately that the evidence constituted proof of guilt beyond a reasonable doubt.

Based on our review of the record, we cannot say the jury's determination was plainly wrong or without credible evidence to support it. The evidence was neither inherently incredible nor so contrary to human experience as to render it unworthy of belief as a matter of law. See Simpson v. Commonwealth, 199 Va. 549, 558, 100 S.E.2d 701, 707 (1957). The trial court, therefore, did not err in refusing to set aside the jury's verdict on the basis of insufficient evidence.

V.  FAILURE TO DISCLOSE EXCULPATORY EVIDENCE

Lockhart further contends the trial court erred in denying his motion to set aside the verdict and dismiss the indictment because of the Commonwealth's failure to disclose exculpatory evidence.  The Commonwealth's failure to provide such evidence, he claims, violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963).

After the trial but prior to sentencing, Lockhart learned that the victim and his family had given pretrial statements in interviews with agents of the Commonwealth investigating the case.  Despite Lockhart's specific and proper request for exculpatory evidence, the Commonwealth failed to disclose to him before trial the existence of those statements and the notes taken by the interviewers in connection with those statements.

The victim's undisclosed statements and the notes associated therewith, Lockhart claims, contained information that was inconsistent with M.B.'s testimony at the preliminary hearing and at trial.  Thus, according to Lockhart, such evidence could have been used to more effectively cross-examine M.B. and further impeach his credibility.  The withheld evidence, he argues, was, therefore, exculpatory and its suppression by the Commonwealth a constitutional violation warranting reversal of his conviction.[2]

---

[2] Lockhart also claims in his brief on appeal that the suppressed statement of the victim's father was exculpatory

Lockhart specifically relies on the following allegations in M.B.'s statements and the associated notes that, according to him, contradict M.B.'s testimony at trial:  (1) Lockhart gave M.B. and the other kids beer and pills; (2) Lockhart required M.B. and A.B. to sleep with him in his bed, one on either side of him, but would not let them sleep in D.'s bed; (3) Lockhart and M.B. slept either naked or in underwear; (4) Lockhart threatened to shoot himself and the boys; (5) pictures were taken of the children in their underwear; (6) Lockhart would not let M.B. use the telephone; (7) Lockhart would not let M.B. in any other room and would not let him use D.'s room; and (8) M.B. never told A.B. about his sexual acts with Lockhart.

The trial court rejected Lockhart's argument related to the suppressed pretrial statements and notes, finding that the credibility of the victim had been the "whole issue at trial" and that having additional evidence available to further impeach the victim would not have "done any more to lessen [his] credibility than [his] credibility was lessened in the eyes of the jury . . . on cross examination."  The court concluded that

---

because it revealed that, just before M.B. told his parents that he had been sexually abused by Lockhart, M.B.'s father had been crying and had suggested that his sons liked Lockhart better than they liked him.  While such evidence may be exculpatory, we do not include the father's statement in our analysis because essentially the same evidence was elicited early in the trial from M.B.'s mother and also admitted by M.B.

the Commonwealth's failure to disclose the subject statements and notes did not violate Brady.

In order for the Commonwealth's withholding of the pretrial interview statements and notes to have constituted a Brady violation, the statements and notes must have been (1) either directly exculpatory or have had impeachment value, (2) suppressed by the government, and (3) material. Strickler v. Greene, 527 U.S. 263, 280-81 (1999). The first two components are unquestionably met. The allegations cited above from M.B.'s statements and the related notes contradict to varying degrees M.B.'s testimony at trial and, thus, had impeachment value. Moreover, there is no dispute that the Commonwealth failed to disclose the subject documents to Lockhart. The determination, however, of whether the third component--materiality--is established by the record is more problematic.

There is no question that, had Lockhart been able to fully discredit M.B.'s testimony, the outcome of the trial would have been different. The evidence suppressed by the Commonwealth could have been used to that end. It, therefore, appears at first blush to be "material."

However, as the United States Supreme Court explained in Strickler:

> That . . . is not the standard the petitioner must satisfy in order to obtain relief. He must convince us that "there is

a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense. . . .  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."
. . . [T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.  Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

Id. at 289-90 (quoting Kyles v. Whitley, 514 U.S. 419, 434-35 (1995)).

The materiality inquiry is a context-specific determination; evidence that is material in one setting could be immaterial in another.  Spicer v. Roxbury Correctional Inst., 194 F.3d 547, 560 (4th Cir. 1999).  In this case, the victim was subjected at trial to substantial impeachment on the details of his story.  The defense repeatedly contrasted his trial testimony and preliminary hearing testimony.  Lockhart's counsel individually highlighted the discrepancies and inconsistencies in his testimony during closing argument.  Still, the jury believed M.B. and found the core facts of his testimony credible.

We agree with the trial court's assessment that the victim's credibility would not have been damaged by the additional impeachment evidence any more than it already had been damaged at trial, particularly because the suppressed evidence was of a no more significant nature than the impeachment evidence already presented at trial. It was simply more of the same type of evidence and would not, we conclude, have put the whole case in such a different light as to undermine confidence in the verdict.

We find, therefore, that when the suppressed impeachment evidence in M.B.'s pretrial statements and the accompanying notes is considered together with all the other impeachment evidence adduced at trial, the additional evidence becomes nothing more than cumulative impeachment evidence and, hence, immaterial in this setting. Thus, we conclude that, on the facts of this case, there is no reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.

As the record does not establish a Brady violation, we hold that the trial court did not err in denying Lockhart's motion to set aside the verdict on this ground.

Accordingly, Lockhart's conviction is affirmed.

Affirmed.