COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:    Chief Judge Decker, Judge O'Brien and Senior Judge Humphreys
Argued by videoconference


EVAN PATRICK BENNETT

v.      Record No. 0453-24-2

COMMONWEALTH OF VIRGINIA

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
MAY 13, 2025


FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
B. Elliott Bondurant, Judge

Kevin Purnell (Kevin D. Purnell, PLLC, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Matthew P. Dullaghan,[1] Senior Assistant
Attorney General, on brief), for appellee.


Evan Patrick Bennett appeals his convictions, rendered in a jury trial, for malicious

wounding and strangulation in violation of Code §§ 18.2-51 and -51.6.  Bennett argues that the

Commonwealth failed to prove he acted with malice and suggests instead that he acted in self-

defense.  He also contends that the trial court should have declared a mistrial when a juror

initially stated that she disagreed with the guilty verdicts and that it compounded the error by

giving an *Allen* charge[2] when it directed the jury to deliberate further.  We hold the trial court did

not err and affirm Bennett's convictions.

---

[1] Matthew P. Dullaghan became an employee of this Court on February 10, 2025.  He has
had no involvement in the Court's review of this case.

[2] The term "*Allen* charge" derives from *Allen v. United States*, 164 U.S. 492, 501-02
(1896), "the seminal case approving the use of a jury instruction encouraging each juror to
reconsider and listen to the conclusions of the other jurors in order to reach a unanimous
verdict," if unanimity can be achieved "without surrendering [one's] conscientious opinion."
*Drexel v. Commonwealth*, 80 Va. App. 720, 745-46, 746 n.8 (2024).

BACKGROUND[3]

Bennett and Charles E. Seay, Jr., the victim, lived next door to each other in a semi-rural area. Their relationship was contentious at times. The criminal convictions at issue stem from Bennett's brutal attack on Seay.

One afternoon in August 2021, Seay returned home while Bennett was mowing his lawn. When Seay left his home a short time later, he had a handgun in a holster at his waist, under his shirt, as he always did.[4] As he drove along his driveway toward the road, he noticed that Bennett stopped mowing his lawn.

Seay got out of his truck near the edge of his property to retrieve mail from his mailbox. Bennett, who was at his own mailbox about sixty-five yards away, quickly approached Seay, walking along the road while yelling "aggressive[ly]." Seay could not understand what Bennett was saying and yelled back, "Come on man, what's your problem." Although Bennett continued to approach, Seay turned to get back into his truck. Bennett grabbed his shirt from behind and jerked him backward, causing Seay to fall to the ground in his driveway. Seay got up, and the two exchanged punches.[5]

---

[3] "Consistent with the standard of review" when assessing the sufficiency of the evidence in a criminal appeal, "we recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn'" from that evidence. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

[4] Seay had a concealed weapon permit. He testified that he had carried a concealed weapon daily for fifteen years. According to the evidence, it was "very common" for residents in that area to carry firearms.

[5] Seay did not reach for his firearm during this portion of the fray.

They then both fell to the ground, with Bennett straddling Seay. Bennett "kneed," hit, and kicked him. With both hands around Seay's throat, Bennett choked him with hard pressure for eight to ten seconds. Seay could not breathe, and his vision became "splotchy." Bennett exclaimed that "he was going to kill" Seay. At that point, Seay reached for his firearm, but it was not in his holster. He managed to get Bennett off him briefly, and the men rolled down a slope. Bennett wrapped an arm around Seay's neck from behind and placed him in a "choke hold" for twenty to thirty seconds. Seay was "gasping for air" and "going in and out of consciousness." Bennett's wife arrived and pulled him off Seay. But Bennett "stomped" on Seay's foot as he and his wife left for their home. Still gasping for air, Seay struggled to stand. He found his gun beside his truck, got back into the truck, and called the police.

Deputies from the King William County Sheriff's Office arrived and questioned Bennett, who claimed that Seay "brandished a firearm" and he "fear[ed] for [his] life." Bennett suggested that Seay started the altercation by calling him insulting names. He also said that Seay reached for his firearm during the incident but did not remove it from the holster.

In the days after the attack, Seay experienced extreme throat soreness and difficulty swallowing. He experienced facial numbness that lasted for months. Seay also sustained a broken orbital bone, abrasions to his nose, face, forehead, and scalp, bruising adjacent to both eyes, and bleeding in his right eye. Seay had several discolored abrasions around his throat. Additionally, he sustained burst blood vessels in his left eye and mouth consistent with strangulation. The back neck area of his t-shirt was ripped, and the front neck area was stretched.

Bennett was indicted for malicious wounding and strangulation. At trial, Seay described Bennett's unprovoked attack.[6] Testimony from a neighbor, Richard Jones, supported Seay's account that Bennett advanced toward Seay near Seay's truck. Jones, who was driving by when the fight began, testified that Bennett was the first one to "throw[] punches" and that he "did not see any firearm."

At the close of the Commonwealth's case-in-chief, Bennett moved to strike the evidence. He argued that he acted in self-defense rather than with malice and that Seay was not credible. The trial court denied Bennett's motion.

Bennett testified in his own defense, contending that the fight occurred on his property, not in Seay's driveway. According to Bennett, Seay, without provocation, "rushed" at him and challenged him to fight. Bennett claimed that Seay reached for his firearm and he responded by putting his arms around Seay to stop him from pulling the gun. He testified that the two then rolled around on the ground as Seay continuously attempted to reach for his gun and punched Bennett. Bennett said he yelled at Seay to stop reaching for the gun. He admitted that he could have choked Seay while trying to get the gun away from him. He believed Seay wanted to kill him and asserted that once he realized the gun was no longer a threat, he withdrew from the fray. He acknowledged that Seay never pointed the gun at him and, in fact, that he never saw the gun outside the holster.

Bennett's wife testified that "a commotion" drew her outside. Bennett and Seay were wrestling, and as she approached them, she heard Bennett telling Seay not to grab the gun. After

---

[6] Seay admitted various discrepancies between his trial testimony and his reports after the attack. He explained that when he spoke with the officers and wrote his statement, he was "very rattled" and was suffering from "excruciating pain." He admitted that when he returned home after the attack, he placed his gun in a safe and did not mention the firearm to police. Seay agreed that his written statement did not mention that Bennett stomped on his foot. And he conceded that he had tried to bite Bennett but never reported that fact to law enforcement.

the fight, she and Bennett returned home while Seay searched the brush for something. Bennett told her repeatedly that Seay had a gun, and she knew that Seay "conceal[ed] carrie[d]."

At the close of all the evidence, Bennett renewed his motion to strike, which the trial court denied. After deliberating for about ninety minutes, the jury informed the trial court that it had reached a verdict. Immediately after the clerk read the verdicts—finding Bennett guilty of malicious wounding and strangulation—Juror 25 spontaneously remarked, "[T]hat is not what I voted for." The trial court then polled the jury, asking each juror if "this [is] your verdict." Juror 25 answered, "No." After the poll, the jury returned to the jury room at the trial court's direction.

Outside the jury's presence, the Commonwealth argued that, in light of Juror 25's comments, the jury should be directed to deliberate further. Bennett contended that giving the jury an *Allen* charge would not cure the problem and the court should grant a mistrial instead, arguing that Juror 25 would be pressured by the others if they were forced to continue deliberating. The court concluded that it was appropriate to direct the jury to deliberate further and it had the authority to do so. In keeping with that ruling, the court brought the jury back into the courtroom and gave them an *Allen* charge. It instructed the jurors that it was their duty to reach a unanimous verdict if they could "possibly . . . do so" without "giv[ing] up [their] honest opinion[s] as to the evidence." A short time later, the jury returned verdicts finding Bennett guilty of the two offenses.[7] This time, all the jurors, when polled individually, confirmed that the verdicts were unanimous.

---

[7] The trial court observed that "a very short period of time" passed between when it gave the *Allen* charge and the jury returned its unanimous verdict. The transcript and the unopposed proffer of defense counsel, taken together, establish that it was a period of seven or eight minutes. A total of about twenty-four minutes passed between when the jury returned its first and second sets of verdicts.

Bennett renewed his motion for a mistrial, adding that the jury's short period of additional deliberations after the *Allen* charge further supported the motion. He also made a motion to set aside the verdicts based on the arguments raised in his motions to strike. The trial court denied both motions and sentenced Bennett to a total of seventeen years' incarceration, with fourteen years suspended.

## ANALYSIS

Bennett challenges his convictions on two grounds. First, he contends that the trial court erred by holding that the evidence was sufficient to support his conviction for malicious wounding. Second, he suggests that it erroneously denied his motion for a mistrial. We examine these claims in turn.

## I. Sufficiency of the Evidence

"[W]hen reviewing whether the evidence was sufficient to convict a defendant of a criminal offense, an appellate court has a 'limited' role . . . ." *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024)). The trial court's judgment confirming the jury's verdicts "is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). The only relevant question on appeal "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact," in this case the jury, "could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact . . . .'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

In assessing the evidence, this Court is mindful that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Maust v. Commonwealth*, 77 Va. App. 687, 702 (2023) (en banc) (alterations in original) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015)). And "[t]he trier of fact is 'free to believe or disbelieve, in part or in whole, the testimony of any witness.'" *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (quoting *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc)). This principle further permits the jury "to disbelieve the self-serving testimony of the accused and to conclude that [he] is lying to conceal his guilt." *Id.* (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)). Credibility determinations simply "will not be disturbed on appeal unless plainly wrong." *Maust*, 77 Va. App. at 703 (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011)).

Bennett argues that the Commonwealth failed to prove he acted with malice, thereby precluding his conviction for malicious wounding.[8] He suggests that the evidence proved he was merely defending himself and supported a conviction of no more than unlawful wounding.[9]

---

[8] In a separate assignment of error, Bennett argues that Seay's testimony was inherently incredible. He suggests that he was entitled to prevail on his self-defense claim as a matter of law, requiring the reversal of his convictions for both malicious wounding and strangulation. At oral argument, however, Bennett's counsel conceded that this inherent incredibility claim was not preserved below, and he withdrew this assignment of error due to waiver. As a result, we do not consider it. The Court appreciates counsel's candor as it "embodies the ethical duties expected of a legal advocate and is held in high esteem." *See Nimety v. Commonwealth*, 66 Va. App. 432, 436 n.3 (2016).

[9] This assignment of error expressly challenges only the element of malice. Bennett's related analysis does not address the elements of the affirmative defense of self-defense or cite any law relevant to the application of that defense. Therefore, we do not separately consider it. *See* Rule 5A:20(e); *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017), *cited with approval in Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018).

A conviction for malicious wounding necessarily requires proof that the defendant acted with malice. *Johnson v. Commonwealth*, 58 Va. App. 303, 316 (2011); *see* Code § 18.2-51. If the evidence instead proves that the accused acted in the heat of passion, the element of malice is negated, supporting a conviction for the lesser-included offense of unlawful wounding. *See Witherow v. Commonwealth*, 65 Va. App. 557, 569 n.4 (2015) (recognizing that fear insufficient to prove justifiable self-defense may nonetheless demonstrate heat of passion). Significantly, whether a defendant acted with malice or in the heat of passion is a question of fact. *See Meade v. Commonwealth*, 74 Va. App. 796, 814 (2022).

Virginia's appellate courts "have 'long defined malice as "the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will."'" *Shaw v. Commonwealth*, ___ Va. ___, ___ (Apr. 17, 2025) (quoting *Watson-Scott v. Commonwealth*, 298 Va. 251, 255-56 (2019)). Malice is established where a defendant "commit[s] a purposeful and cruel act without any or without great provocation." *Synan v. Commonwealth*, 67 Va. App. 173, 187 (2017) (quoting *Robertson v. Commonwealth*, 31 Va. App. 814, 823 (2000)). This state of mind "may exist alongside and arise from 'anger, hatred[,] and revenge' as well as any other 'unlawful and [unjustified] motive.'" *Meade*, 74 Va. App. at 813 (alterations in original) (quoting *Watson-Scott*, 298 Va. at 256). It "may be either express or implied by conduct." *Watson-Scott*, 298 Va. at 256 (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)). "[M]alice is implied by law from any deliberate, willful, and cruel act against another, however sudden." *Witherow*, 65 Va. App. at 566 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982)).

"In contrast to the deliberate mind required for malice, '[h]eat of passion refers to the *furor brevis* [that] renders a man deaf to the voice of reason.' . . . [U]nlike malice, the heat of passion [involv]es '. . . act[ing] on impulse without conscious reflection.'" *Meade*, 74 Va. App. at 814 (first alteration in original) (quoting *Rhodes v. Commonwealth*, 41 Va. App. 195, 200

- 8 -

(2003)). Even so, that impulse must be based on "reasonable provocation," such as "rage, fear, or a combination of both." *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986); *cf. Taylor v. Commonwealth*, 77 Va. App. 149, 171 (2023) (noting that an act in self-defense "must be proportional to the threat posed" (quoting *Peeples v. Commonwealth*, 30 Va. App. 626, 635 (1999) (en banc))).

Bennett argues that Seay instigated the violent altercation by "approach[ing him] while reaching for his firearm" and that Bennett acted merely "to protect himself from harm from Seay." He further suggests that Seay's failure to tell the police he was armed showed that his version of the events was not worthy of belief.

The bottom line here is that the jury was presented with conflicting accounts of what took place and was responsible for determining which one to credit. Seay testified that Bennett was the aggressor. He explained that although he was carrying a firearm in a holster, Bennett started the fight by rushing him on his own property and attacking him from behind. Seay's mail and various personal possessions were found on or beside his driveway where he said the attack took place. His account was further bolstered by the testimony of Jones, a neighbor not shown to be biased for or against either man. Jones saw Bennett advance toward Seay and "throw[ the first] punches," and Jones did not see a firearm. Seay denied calling Bennett any names, brandishing his firearm, or threatening Bennett during the entire attack. In fact, Seay testified that he did not reach for his firearm until Bennett pinned him to the ground, beat and choked him, and threatened to kill him. Seay further explained that when he reached for his gun at that time, it was not in his holster. Although Bennett claimed that he saw Seay's gun before the attack, he admitted that he did not see Seay point the weapon at him or even remove it from the holster at that time.

In determining the credibility of the witnesses, the jury was able to consider any omissions in Seay's description of the incident to law enforcement and inconsistencies between those descriptions and his testimony. *See generally Lockhart v. Commonwealth*, 34 Va. App. 329, 342 (2001) (holding that the trier of fact is free to credit a witness's testimony even if the witness's prior statements contained inconsistencies). It also had the opportunity to consider Seay's explanations for those omissions and inconsistencies. Faced with all the evidence, the jury could reasonably have credited Seay's account of the attack, supported by other evidence, and concluded that Bennett was not acting in self-defense. *See Garrick*, 303 Va. at 182; *Washington*, 75 Va. App. at 615-16.

The circumstances under which Bennett wounded Seay and the severity of the injuries he inflicted support the jury's factual finding that Bennett acted with malice. *See Burkeen v. Commonwealth*, 286 Va. 255, 260-61 (2013). Although Seay had a gun, he did not point it at Bennett or even intentionally remove it from its holster. Bennett instigated the fight by approaching Seay in Seay's own driveway in an angry and aggressive manner. *See Virginia v. Commonwealth*, 17 Va. App. 684, 688 (1994). When Seay attempted to get back into his truck and leave to avoid the altercation, Bennett pulled him backward with such force that he ripped Seay's shirt and caused him to fall. Bennett then beat, kicked, and "kneed" Seay, breaking his orbital bone and inflicting other injuries. At one point, Bennett choked Seay with both hands and threatened to kill him. He continued the attack even after Seay's gun became dislodged from its holster and was out of reach. He then put Seay in a choke hold, causing him to lapse in and out of consciousness. The combined effects of the beating and choking caused numerous injuries to Seay's face, neck, and scalp. Bennett did not stop the attack until his wife pulled him off Seay, who was lying severely injured on the ground. Bennett stomped on Seay's foot as he was leaving. The violence, brutality, and length of Bennett's unprovoked attack amply support the

jury's finding that he acted with malice. *See Ramos v. Commonwealth*, 71 Va. App. 150, 162-63 (2019).

In sum, the jury's finding that Bennett was the aggressor and maliciously wounded Seay was not plainly wrong or without supporting evidence. As a result, the trial court did not err by denying Bennett's motions to strike the evidence and set aside the malicious wounding verdict.

## II. Unanimity of the Jury Verdict

"Under settled principles of appellate review, 'the party moving for a mistrial . . . has the burden of establishing a manifest probability of prejudice.'" *Brown v. Commonwealth*, 64 Va. App. 59, 67 (2014) (quoting *Perez v. Commonwealth*, 40 Va. App. 648, 655 (2003)); *see Clark v. Commonwealth*, 78 Va. App. 726, 756 (2023). And granting a mistrial is a drastic remedy available only in extreme circumstances. *See Prieto v. Commonwealth*, 278 Va. 366, 389 (2009).

The appellate court reviews the denial of a motion for a mistrial under an abuse-of-discretion standard. *Id.* It examines a decision about whether to give a jury instruction, in this case an *Allen* instruction, under the same standard. *See Drexel v. Commonwealth*, 80 Va. App. 720, 742, 746 (2024). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, ___ Va. ___, ___ (Nov. 14, 2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). Under this standard, when a trial court "has a range of choice," the appellate court will not disturb its decision "as long as it stays within that range and is not influenced by any mistake of law." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563-64 (2016) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212-13 (2013)). "This bell-shaped curve of reasonability [is based] on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Id.* at 564 (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). We apply these clear legal standards here.

Bennett contends that the trial court's response when the jury returned a nonunanimous verdict was error. He suggests that the court should have granted his motion for a mistrial at that time and abused its discretion by instead giving the jury an *Allen* instruction directing it to deliberate further. We disagree for the reasons that follow.

The Virginia Constitution "guarantee[s] criminal defendants 'the right to a speedy and public trial, by an impartial jury . . . , without whose *unanimous* consent he cannot be found guilty.'" *Richardson v. Commonwealth*, 67 Va. App. 436, 442 (2017) (emphasis added) (quoting Va. Const. art. I, § 8). But "when jurors have announced their inability to agree[,] it is within the discretion of the trial court to urge on them an earnest effort to reach an agreement." *Drexel*, 80 Va. App. at 746 (quoting *Poindexter v. Commonwealth*, 213 Va. 212, 215 (1972)). This situation is known as a jury "deadlock," and the instruction to continue deliberating in an effort to reach agreement is commonly known as an "*Allen* charge." *Prieto*, 278 Va. at 386-87. "In giving this instruction, a trial court can 'remind[] the jury of the need to reach a verdict if one can be reached without any individual juror giving up his or her conviction[s].'" *Drexel*, 80 Va. App. at 746 (first alteration in original) (quoting *Prieto*, 278 Va. at 387). The recognized purpose of the instruction is to balance fairness to the accused against the time and expense of trial and "the fact that in the event of a disagreement the case will [likely] have to be decided by some [other] jury . . . on the same evidence." *Poindexter*, 213 Va. at 215 (quoting *Petcosky v. Bowman*, 197 Va. 240, 252-53 (1955)); *see also Prieto*, 278 Va. at 389 (recognizing that "granting . . . a mistrial for manifest necessity may become necessary [if] the jury ceases to function as a jury").

A different but related legal principle relevant in this case is that "[o]nce [a] jury has returned its verdict 'in open court,' a defendant has a right to have the jury 'polled individually,' to confirm that each juror joins in the verdict and that it is, in fact, unanimous." *Bethea v. Commonwealth*, 68 Va. App. 487, 506 (2018) (quoting *Humbert v. Commonwealth*, 29 Va. App.

- 12 -

783, 792 (1999)), *aff'd on other grounds*, 297 Va. 730 (2019). Virginia's Rules of Court expressly provide that if jurors fail to agree on the outcome when "polled individually" after seeming to return a verdict, "the jury may be directed to retire for further deliberations or may be discharged."[10] Rule 3A:17(d); *see* Code § 8.01-361 (authorizing a trial court to "discharge the jury when it appears that they cannot agree on a verdict or that there is a manifest necessity for such discharge").

These two different sets of legal standards are well established individually, but the way in which they interact presents a novel issue for appellate court review. Bennett argues that the trial court's decision to give an *Allen* instruction *after* the jury returned the nonunanimous verdict was error. Relatedly, he suggests that the additional time the jury spent deliberating was inadequate to permit those deliberations to be meaningful.

### A. *Allen* Instruction

Bennett contends that the trial court's decision to give an *Allen* instruction was error for two reasons—because the procedural posture of the case did not involve a "deadlocked" jury in the traditional sense and because the identity of the nonunanimous juror was known outside the jury room. On these facts, he suggests that the *Allen* charge inappropriately "subject[ed Juror 25] to pressure" and "singled [her] out to conform."[11]

---

[10] No right exists under such circumstances "to a special poll to inquire how or why each juror arrived at the verdict." *Bethea*, 68 Va. App. at 506 (quoting *Humbert*, 29 Va. App. at 792). And subject to narrow exceptions not applicable here, a juror is precluded from testifying as to any specific matter or statement made during the jury's deliberations. Va. Rule Evid. 2:606(b). If "a juror's response to a poll" indicates *confusion*, however, the "trial court has discretionary authority to ask appropriate neutral questions to clarify matters of confusion." *Carver v. Commonwealth*, 17 Va. App. 7, 10 (1993); *see id.* (holding that the juror's spontaneous explanation during the jury poll did not indicate a need for clarification and instead showed a disregard of the court's instructions).

[11] Bennett does not contest the content of the instruction generally, which tracked the model instruction. *See* 1 Model Jury Instrs.—Crim. No. 2.780.

Bennett posits that a true jury deadlock prevents the return of *any* verdicts, while the jury in his case returned verdicts. He points out that "a juror clearly opposed [the] verdicts" sua sponte and when polled. In this context, Bennett believes the law regarding a deadlocked jury is inapplicable.

We conclude that these factual distinctions are not legally significant. A deadlocked jury is one that "cannot reach a verdict by the required voting margin." *Hung Jury*, *Black's Law Dictionary* (12th ed. 2024) (noting that "hung jury" and "deadlocked jury" are synonyms); *see also Fowlkes v. State*, 451 A.2d 1270, 1272 (Md. Ct. Spec. App. 1982) ("A deadlock occurs when jurors differ because of conscientiously held convictions." (emphasis omitted)). Absent further activity, for all practical purposes, Bennett's jury was deadlocked because it had demonstrated an inability to "reach a verdict by the required voting margin." *See Hung Jury*, *Black's Law Dictionary*, *supra*. Although the jury verdicts bore the foreman's signature, they did not constitute valid verdicts because a single juror made clear that the verdicts were not unanimous. Juror 25 plainly said, "[T]hat is not what I voted for," and replied, "No," when asked if she joined the verdicts. But neither Juror 25's comment nor her response in open court reflected an inability of the jury as a whole to benefit from the opportunity to deliberate further after receiving an *Allen* instruction. *Cf. Prieto*, 278 Va. at 385, 388 (approving a verdict delivered following an *Allen* instruction given when a juror sent a note to the court "indicat[ing] that . . . his decision [on a key sentencing issue] was 'firm and final[]' and deliberations had crossed into peer pressure").

The only difference between the typical deadlocked jury and the situation here is that the identity of the juror responsible for the nonunanimous verdicts was known outside the jury room. And Rule 3A:17 specifically permits the trial court to direct the jury to deliberate further in an effort to reach a verdict in precisely these circumstances—when the identity of the dissenting

juror is known due to the poll.[12]  The decision in *Carver v. Commonwealth*, 17 Va. App. 7

(1993), upon which Bennett relies exclusively, does not require a different result.  In *Carver*, this

Court held "that when a juror, who fully understands the import of the question presented by the

court in the polling of the jury, answers that his or her belief is contrary to the verdict rendered, the

verdict is not unanimous and cannot be accepted." *Id.* at 11.  But, quoting Rule 3A:17(d), the Court

explained that "the trial judge erred in accepting the verdict as rendered" in that case "*without*

*further deliberation of the jury*." *Id.* (emphasis added).

Unlike the trial court in *Carver*, the trial court here properly recognized that the

nonunanimous verdicts could not be accepted without further deliberations.  The court exercised

its discretion in a way expressly permitted under Rule 3A:17(d) by directing the jury to resume

deliberations.  That rule specifically contemplates a nonunanimous jury verdict in which at least

one juror, in open court, has not joined the verdict, and it expressly grants the court discretion in

those circumstances to direct the jury to deliberate further.  As the instant trial court emphasized,

all jurors are subject to experiencing some degree of pressure during the process of deliberating,

and nothing in this record suggests that Juror 25 was subjected to undue pressure.[13]  *See*

*generally Bethea*, 68 Va. App. at 507 n.12, 508 (recognizing that a defendant is not entitled to

conflict-free jury deliberations).  To the contrary, Juror 25 readily spoke up in open court and

expressed her disagreement with the first set of verdicts without even waiting for the jury poll,

proving she was not afraid to voice her opinion.  She also said "No" when asked during the first

---

[12] Rule 3A:17(d) provides: "When a verdict is returned, the jury must be polled individually at the request of any party or upon the court's own motion.  If upon the poll, all jurors do not agree, the jury may be directed to retire for further deliberations or may be discharged."

[13] By definition, a dissenting juror's identity is exposed every time a jury is polled and a juror gives a negative response, yet the rule expressly allows for additional deliberations in these circumstances.

poll whether the verdicts were hers.  Later, when polled regarding her vote *after* the *Allen* instruction and the second round of deliberations, Juror 25 did not equivocate.  *See Prieto v. Commonwealth*, 283 Va. 149, 169 (2012).  Instead, she agreed without comment that those were her verdicts.

Finally, nothing in the specific text of the *Allen* instruction renders it inapplicable on these facts, and Bennett provides no controlling law or persuasive argument suggesting otherwise.  The language in the *Allen* charge fit the situation at hand.  We hold that the relevant law and Rules of Court expressly permitted the actions taken by the court under these circumstances.  The trial court did not abuse its discretion.

### B.  Length of Jury Deliberations

Bennett points out that the jury deliberated for only about five more minutes after it was expressly sent back to deliberate further under the *Allen* instruction.  He contends that accepting the later unanimous guilty verdicts under these circumstances "[wa]s a clear manifest . . . injustice [because] no meaningful deliberations could have [occurred] in th[at] . . . almost nonexistent time."  Bennett fails to meet his burden of proof regarding this argument for two reasons.

First, Rule 3A:17 does not contain any time requirement for additional deliberations after a jury returns a nonunanimous verdict.  Bennett cites no law requiring a minimum duration for jury deliberations after the receipt of an *Allen* charge.  Instead, "the length of the jury's subsequent deliberations" after receiving an *Allen* instruction is merely one factor in assessing whether the instruction was unduly coercive.  *United States v. Cornell*, 780 F.3d 616, 626 (4th Cir. 2015).[14]  Beyond the short period of additional deliberations and knowledge of the

---

[14] A jury generally "is not required to deliberate for any set length of time."  *United States v. Burfoot*, 899 F.3d 326, 342 (4th Cir. 2018) (quoting *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999)); *see also Rees v. Commonwealth*, 203 Va. 850, 861-62 (1962)

dissenting juror's identity, Bennett does not point to any other factors reflecting possible coercion. In context, these factors do not reflect that Juror 25 was coerced into rendering guilty verdicts.

Second, Bennett's complaint about the duration of the post-*Allen* charge deliberations fails to acknowledge two other relevant time periods. He does not account for the time the jury spent in the jury room *after* returning the nonunanimous verdicts and *before* receiving the *Allen* instruction. While the attorneys and the court considered how to handle the nonunanimous verdicts, the jury returned to the jury room. The court did not instruct the jurors to avoid additional deliberations during that time, a fact that defense counsel acknowledged below. Additionally, the jury had already spent about ninety minutes deliberating *before* returning the nonunanimous verdicts, during which the jurors presumably discussed the elements of the offenses and their respective views of the evidence. Further, all the other jurors appeared to believe they had rendered unanimous verdicts the first time, as reflected by the signed verdict forms and first poll. Juror 25's disavowal could have been based on something that was quickly remedied when the jurors returned to the jury room after receiving the *Allen* instruction.[15] Jurors are presumed to follow instructions, and beyond polling, the law does not permit further inquiry in this context. *See Bethea*, 68 Va. App. at 505-06, 505 n.10, 508 (noting that with very limited exceptions, "Virginia diligently protects 'the inviolability and secrecy of jurors' deliberations'"

---

(rejecting a defendant's request for a new trial to permit a change of venue where the jury deliberated for about fifty-six minutes following a nine-day trial because "[n]o case ha[d] been cited holding that deliberation" of that length showed error "as a matter of law"); *cf. also Simmons v. Boyd*, 199 Va. 806, 814 (1958) (holding in a civil case that jury trials "frequently" result in "short deliberations" and brevity did "not indicate that the [improper] mention of insurance actuated bias or prejudice [by] the jury").

[15] If, for example, Juror 25's responses to the reading of the verdicts and the jury poll resulted from mere confusion on that juror's part, then that confusion likely was easily resolved once deliberations resumed, without coercive effect from the *Allen* instruction.

and jurors "should not be called to testify about [their] discussions" (quoting *Jenkins v. Commonwealth*, 244 Va. 445, 460 (1992))).  Consequently, the short duration of the jury deliberations after the *Allen* charge was given simply does not support a claim of coercion or other related error.

Based on all the circumstances, including the outcome of the second jury poll, Bennett "has not borne his burden of demonstrating 'a probability of prejudice'" necessary to compel a mistrial.  *See id.* at 508.  Accordingly, the trial court did not abuse its discretion by denying the mistrial motion.

CONCLUSION

We hold the evidence proved that Bennett acted with malice and not in self-defense.  We also conclude that the trial court did not abuse its discretion by denying his motion for a mistrial and instead giving an *Allen* charge and accepting the jury's subsequent unanimous verdicts.  For these reasons, the trial court's judgment is affirmed.

*Affirmed.*